**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | |
| Plaintiff, | **Case No.**: **2:23-cv-11552** |
| v. | **DEMAND FOR JURY TRIAL** |
| **DWIGHT A. FOSTER, and K.E.L. ENTERPRISES, INC.,** | |
| Defendants. | |

**COMPLAINT FOR INJUNCTIVE RELIEF, RESTITUTION, DISGORGEMENT AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT**

Plaintiff, Commodity Futures Trading Commission ("CFTC" or

Commission"), by and through its attorneys, alleges as follows:

## I.     SUMMARY

1.     From at least January 1, 2017 to the present (the "Relevant Period"),

Dwight A. Foster ("Foster"), and K.E.L. Enterprises, Inc. ("KEL"), (collectively,

"Defendants"), engaged in a multimillion-dollar fraudulent scheme through which

they solicited not less than $13.2 million from at least 45 members of the public to

participate in a commodity pool operated by Foster and KEL ("commodity pool"

or "Pool"), for the purpose of trading in commodity interests, including foreign

currency ("forex") pairs on a leveraged, margined or financed basis with

1

participants who are not eligible contract participants ("ECPs") and forex futures contracts.

2.      Instead of trading pool participants' funds as promised, Defendants misappropriated all of the pool participants' funds by depositing them directly into Defendants' corporate bank accounts, rather than depositing the funds directly into an account carried in the name of the Pool at a Futures Commission Merchant ("FCM") and/or a retail foreign exchange dealer ("RFED").  Defendants misappropriated, and continue to misappropriate, participants' funds to pay Fosters' personal expenses, including, but not limited to: car payments, insurance, credit cards payments, and other daily living expenses.  Additionally, Defendants used not less than $10.1 million of later-in-time participants' funds to pay earlier-in-time participants purported "profits" and/or "redemptions" in the nature of a Ponzi scheme.

3.      Defendants took steps to conceal their fraud by, among other things, sending pool participants false monthly account statements which purported to show that Defendants' Pool consistently traded at a profit each month during the Relevant Period.

4.      Throughout the Relevant Period, while operating a business that was of the nature of a commodity pool, Defendants used the Internet, interstate wires, and other means or instrumentalities of interstate commerce, directly or indirectly,

to employ a device, scheme, or artifice to defraud existing and prospective

participants, and to engage in transactions, practices, or a course of business that

operated as a fraud or deceit upon existing and prospective participants.  Foster,

individually and as the agent of KEL, made, and continues to make, fraudulent

omissions of material facts in solicitations to actual and prospective pool

participants and in monthly account statements to actual participants, including but

not limited to failing to disclose that:  (1) Defendants never traded pool participant

funds as promised; (2) Defendants did not open forex trading accounts in the name

of the Pool with any lawfully operating commodity exchange, or with any

registered FCM or RFED; (3) Defendants misappropriated, and are continuing to

misappropriate, participants' funds; (4) the monthly "statements" Defendants sent

to participants showing purported monthly profits were false, created by Foster,

and not reflective of actual trading; (5) KEL was unlawfully acting, and continues

to unlawfully act, as an unregistered commodity pool operator ("CPO"); and (6)

Foster was unlawfully acting, and continues to unlawfully act, as an unregistered

associated person ("AP") of a CPO.

5.      Throughout the Relevant Period, KEL acted at all times, and

continues to act, as a CPO without being registered with the Commission.

Throughout the Relevant Period, Foster acted at all times, and continues to act, as

an AP of a CPO without being registered with the Commission.  At no time during

the Relevant Period did KEL keep and maintain the records required to be kept and maintained by a CPO, in violation of Regulations 4.21-4.23, 17 C.F.R. §§ 4.21-4.23 (2022).

6.     By this conduct, and the conduct further described herein, Defendants have engaged, are engaging and/or are about to engage in acts and practices in violation of Sections 2(c)(2)(C)(iii)(I)(cc), 4k(2), 4m(1), and 4o(1)(A)-(B) of the Commodity Exchange Act, ("Act"), 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2), 6m(1), 6o(1)(A)-(B), and Commission Regulations ("Regulation") 4.20(a)(1), (b), and (c), 4.21-4.23, and 5.3(a)(2)(i) and (ii), 17 C.F.R. §§ 4.20(a)(1), (b), (c), 4.21-4.23, 5.3(a)(2)(i), (ii) (2022).

7.     The acts and omissions described herein have all been done by Foster within the scope of his employment or office at KEL during the Relevant Period. Therefore, KEL is liable for all acts and omissions described herein by Foster, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022).

8.     Foster was, and is, a controlling person of KEL and did not act in good faith or knowingly induced KEL's violations of the Act and Regulations described herein during the Relevant Period.  Therefore, Foster is liable for KEL's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

9.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the CFTC brings this action to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act and the Regulations promulgated thereunder. In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, post-judgment interest, and such other and further relief as the Court deems necessary and appropriate.

10.     Unless restrained and enjoined by this Court, Defendants will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as described below.

## II.    JURISDICTION AND VENUE

11.     This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by act of Congress).  In addition, Section 6c of the Act, 7 U.S.C. § 13a-1, provides that U.S. district courts possess jurisdiction to hear actions brought by the CFTC for injunctive relief or to enforce compliance with the Act whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation,

or order thereunder.

12.     Venue lies properly with this Court pursuant to Section 6c(e) of the

Act, 7 U.S.C. § 13a-1(e), because Defendants reside and/or transact business in this

District, and certain transactions, acts, practices, and courses of business alleged in

this Complaint occurred, are occurring, or are about to occur in this District.

### III.    THE PARTIES

13.     Plaintiff **Commodity Futures Trading Commission** is an

independent federal regulatory agency charged by Congress with the

administration and enforcement of the Act, 7 U.S.C. §§ 1-26, and the Regulations

promulgated thereunder, 17 C.F.R. pts. 1–190 (2022).

14.     Defendant **Dwight A. Foster** is a dual citizen of the United States and

Canada.  Foster's last known residence is in West Bloomfield, Michigan.  Foster

holds himself out as the President and CEO of KEL.  Foster has never been

registered with the CFTC in any capacity.

15.     Defendant **K.E.L. Enterprises, Inc.** is a company organized and

operated pursuant to the laws of the State of Michigan on or about November 19,

1984.  Foster is identified in the records of the Michigan Secretary of State,

Corporations Division, as the President, Vice President, Treasurer and Secretary of

KEL, as well as its registered agent.  The records of the Michigan Secretary of

State, Corporations Division, identifies KEL's principal place of business as

located in West Bloomfield, Michigan.  KEL has never been registered with the CFTC in any capacity.

### IV.   <u>RELATED ENTITES</u>

16.   **The QYU Holdings Inc.** is a corporation organized and operated pursuant to the laws of the State of Wyoming, with its principal place of business in Dallas, Texas.  It is owned by third parties not named in this Complaint.  The QYU Holdings Inc. has never been registered with the CFTC in any capacity.

17.   **QYU Holdings Corporation** is a corporation organized and operated pursuant to the laws of the Republic of Panama.  It is owned by third parties not named in this Complaint.  QYU Holdings Corporation was registered with the CFTC as a commodity trading advisor ("CTA") on December 30, 2013; that registration was withdrawn on March 7, 2018.  QYU Holdings Corporation was registered with the CFTC as a CPO on September 11, 2015; that registration was withdrawn on March 7, 2018.  QYU Holdings Corporation has not been registered with the CFTC in any capacity since March 7, 2018.

18.   **QYU Holdings Limited LLC** is a corporation organized and operated pursuant to the laws of Florida.  It is owned by third parties not named in this Complaint.  QYU Holdings Limited LLC has never been registered with the CFTC in any capacity.

## V.    <u>STATUTORY BACKGROUND</u>

19.     Section 2(c)(2)(C)(i)(I)(aa) and (bb) of the Act, 7 U.S.C.

§ 2(c)(2)(C)(i)(I)(aa), (bb), provides in relevant part that the Act applies to, and the

CFTC shall have jurisdiction over, an agreement, contract or transaction in forex

that is offered to, or entered into with, a person that is not an ECP, unless the

counterparty, or the person offering to be the counterparty, of the person is one of

the enumerated exceptions not applicable here, and is offered, or entered into, on a

leveraged or margined basis, or financed by the offeror, the counterparty, or a

person acting in concert with the offeror or counterparty on a similar basis.

20.     An ECP is defined by Section 1a(18)(A)(xi) of the Act, 7 U.S.C.

§ 1a(18)(A)(xi), in relevant part, as an individual who has amounts invested on a

discretionary basis, the aggregate of which is in excess of $10,000,000, or

$5,000,000 and who enters into the agreement, contract or transaction to manage

the risk associated with an asset owned or a liability incurred, or reasonably likely

to be owned or incurred, by the individual.

21.     A commodity pool operator is defined by Section 1a(11)(A)(i-ii) of

the Act, 7 U.S.C. § 1a(11)(A)(i-ii), in relevant part, as a person engaged in a

business that is in the nature of a commodity pool, investment trust, syndicate, or

similar form of enterprise, and who in connection therewith, solicits, accepts, or

receives from others, funds, securities or property, either directly or through capital

contributions, the sale of stock, or other forms of securities, or otherwise, for the purpose of trading commodity interests, including any agreement, contract, or transaction described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(C)(i).

22.     A commodity pool is defined by Section 1a(10)(A) of the Act, 7 U.S.C. § 1a(10)(A), in relevant part, as any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading commodity interests, including commodities for future delivery, and transactions, agreements or contracts in foreign currency as described by 7 U.S.C. § 2(c)(2)(C)(i).

## VI.    FACTS

**A.    The Fraudulent Scheme**

   **a. Defendants' Solicitations to Participants**

23.     Beginning in January 2017, Foster solicited members of the public to participate in a commodity pool purportedly operated KEL, for the purpose of trading in commodity interests, including forex currency pairs on a leveraged, margined or financed basis and forex futures contracts.  Foster targeted the solicitations to participants who were not ECPs, and who were generally not sophisticated financially.  Many of the individuals who were solicited by Foster, and who ultimately become participants in Defendants' Pool, were friends and family members of Foster and had little to no experience trading forex or commodity interests.

24.     Throughout the Relevant Period, Foster solicited current and prospective pool participants through direct, person-to-person solicitations, and recommendations from current pool participants.  As part of the solicitation process, Defendants provided actual and prospective pool participants with written solicitation materials from QYU Holdings Corporation, which was described in the solicitation materials as "a boutique professional trading firm which specializes in the commodities and foreign exchange market."

25.     Foster represented to actual and prospective pool participants that KEL pooled participants' funds at a trading account in the name of KEL at QYU Holdings Corporation.  However, such representations were false because no participant funds were sent by Defendants to a bank account carried in the name of QYU Holdings Corporation or traded in a pool operated by Defendants or QYU Holdings Corporation.  Although some pool participants' funds were ultimately transferred from Defendants' bank accounts to other QYU entities' bank accounts, none of the funds were used to trade forex on behalf of the pool participants.

26.     Throughout the Relevant Period, Foster, individually and as the agent of KEL, provided written solicitation material from QYU Holdings Corporation to actual and prospective participants that touted its trading experience and the "QYU Edge." For example, the solicitation material stated:

> QYU's strength in trading, or QYU's "Edge," is built on our exceptional understanding and analysis of the nuances of the US economy and our

expert skill in dealing with financial markets…To summarize, the majority of our trades involve pairing the US Dollar with one of the seven major currencies.

The average person does not understand the great influence that trade agreements have on the world's countries because only an elite few benefit directly from those trade relationships.  Those elite few may argue that the masses also gain a benefit from these agreements, but those benefits are only through ancillary effects.

Part of our success in the foreign currency markets comes from our ability to understand and analyze all of these economic components and relationships. The other part of our success comes from our trading skill which is based on our expert understanding of market behavior.

27.    Foster, individually and as the agent of KEL, also represented to actual and prospective participants that their funds were pooled with the funds of other participants in a KEL Pool purportedly carried at QYU Holdings Corporation in the "KEL Corporate-QYU Holdings Account," the "KEL Corporate QYU Account," or the "KEL Corporate-QYU Holdings Vader Account."  These representations were false.

28.    Defendants never operated a commodity pool as an entity cognizable as a separate legal entity at any registered FCM or RFED.  QYU Holdings Corporation never operated a commodity pool at any registered FCM or RFED, and Defendants never transferred participant funds from their bank accounts to any commodity interest trading account.  There are no commodity interest accounts operated or controlled by Defendants at any registered FCM and/or RFED.

29.   Once pool participants decided to participate in Defendants' Pool, they were given "promissory notes" from KEL, which were signed by Foster as the agent of KEL.  The "promissory notes" promised a return of the pool participant's principal investment amount plus "seventy percent of any profits attributable to the management of the borrowed funds."  Defendants further represented that the funds would be transferred into a pooled investment vehicle "to be managed accordingly."  For example, at least one promissory note stated:

> The borrowed funds will be placed into KEL's Corporate–QYU Holdings–Vader Account, to be managed accordingly.  A monthly account statement will be provided to the Borrower, indicating the status of the Borrower's Promissory Note Account.

**b.  False Statements**

30.   After accepting participants' funds, Defendants sent pool participants monthly statements which falsely showed each pool participant's "Monthly/YTD (year to date) Account Balances and Dividend Results, for [their] pro-rate share" in Defendants' Pool.  The statements referred to various accounts supposedly held at QYU Holdings Corporation, including the "KEL Corporate-QYU Holdings Account," the "KEL Corporate QYU Account," or the "KEL Corporate-QYU Holdings Vader Account."  These statements were false.  There were no such accounts.

31.   These pooled accounts were purportedly held at QYU Holdings Corporation.  Defendants represented to participants that their funds were pooled

in these accounts, which were purportedly then traded on behalf of the Pool by QYU Holdings Corporation.  These statements, sent to participants through interstate commerce, purported to show that Defendants' Pool traded at a profit each month during the Relevant Period.  These statements were false, and no trading took place on behalf of the pool participants.

### c. Omissions of Material Facts

32.    In furtherance of the fraudulent scheme, Foster, individually and as the agent of KEL, made fraudulent omissions of material facts in solicitations to actual and prospective pool participants, including but not limited to, failing to disclose that: Defendants were misappropriating participants' funds; Defendants were using later-in-time participants' funds to pay purported "profits" and/or "redemptions" to earlier-in-time participants, in the nature of a "Ponzi" scheme; Defendants were not registered with the Commission as CPOs, APs of CPOs, or in any other capacity; there was no "KEL Corporate-QYU Holdings Account," "KEL Corporate QYU Account," or "KEL Corporate-QYU Holdings Vader Account" into which participants funds were traded on behalf of the Pool; participants' funds were not used for trading forex futures contracts on any lawfully operating exchange; participants' funds were not used for trading forex currency pairs on a leveraged, margined or financed basis, with any registered FCM or RFED; guaranteed return promises were fraudulent as a matter of law given the volatility

of the forex market; and, the monthly "statements" Defendants send to participants showing monthly profits were created by Foster and not reflective of actual trading.

33.    Defendants' omissions of facts were, and are, material.  Defendants failed to advise participants that at no time throughout the Relevant Period did Defendants transfer any participant funds to a commodity pool trading account or bank account in the name of QYU Holdings Corporation, or to any commodity trading account carried in the name of a CPO and/or RFED registered with the Commission.  Rather than have participants send their funds directly to an FCM and/or RFED carrying a forex trading account in the name of the Pool, Defendants accepted participants' funds by depositing them into a bank account ending in *4991 carried in the name of KEL at J.P. Morgan Chase ("JPMC account").  The funds were then transferred by Defendants to a bank account ending in *4708 carried in the name of The QYU Holdings Inc. at Bank of America ("BOA account").  Foster was, and remains, the primary signatory on the JPMC account.

34.    For example, between March 16, 2021 to April 7, 2021, Defendants accepted $1,036,000 sent by pool participants for the purpose of participating in Defendants' purported forex trading pool.  On March 16, 2021, Defendants deposited into the KEL JPMC account $1,000,000 accepted from a participant for the purpose of purchasing a participation in Defendants' purported Pool.  On

March 29, 2021, Foster wired $500,000 of these funds from the KEL JPMC account to The QYU Holdings Inc.'s BOA account. On March 30, 2021, Foster wired the remaining $500,000 from the KEL JPMC account to The QYU Holdings Inc.'s BOA account. During the period March 29, 2021 to April 7, 2021, The QYU Holdings Inc. BOA account received an additional $150,000 from the KEL JPMC account—all funds from pool participants.

35.    All of these funds were misappropriated. During the period March 30, 2021 to April 7, 2021, The QYU Holdings Inc. BOA account returned $74,000 to the KEL JPMC account. Defendants fraudulently used these returned pool participant funds to pay $1,108,161 to earlier-in-time participants in the form of purported "redemptions." Because Defendants did not actually operate a forex trading pool on behalf of the pool participants, the "redemption" payments were actually Ponzi-like scheme payments made from funds Defendants obtained from later-in-time pool participants.

36.    In addition, the QYU Holdings Inc. BOA account records show that during this period, $108,000 was transferred to QYU Technologies Corp. in the Republic of Panama, $74,000 to Defendants, and additional payments totaling $398,348 to third parties unassociated with any forex trading activity. None of the funds that were originally transferred from the KEL JPMC account to The QYU Holdings Inc. BOA account, and back again, were deposited into a Pool trading

account or used for trading forex commodity interests on behalf of pool participants.

37.     Throughout the Relevant Period, Defendants commingled participants' funds with third party funds by accepting participants' funds into bank accounts which were carried in the name of KEL, and controlled by Foster. Defendants subsequently transferred participants' funds into bank accounts of third parties, unrelated to Defendants' Pool.  At no time during the Relevant Period did Defendants deposit participant funds into an account carried in the name of the Pool at a registered FCM or RFED.

38.     For example, Foster, as the person in control of the KEL JPMC account, misappropriated, and subsequently transferred the following participant funds:  $779,129.81 to a bank account at TD Bank Toronto carried in the name of QYU Holdings, Ltd.; $6,745,065.37 to The QYU Holdings Inc. BOA account; $1,035,975.00 to a bank account at JPMC ending in *6519; and $2,851,616.38 to a bank account at BOA ending in *5733 carried in the name of The QYU Holdings Inc.  None of these funds transferred by Defendants were deposited into a Pool trading account or used for trading forex commodity interests on behalf of participants.

**B.     Failure to Make Disclosures and to Keep and Maintain Required Books and Records**

39.     Throughout the Relevant Period, KEL, as the CPO, failed to keep and maintain books and records required to be maintained by a CPO pursuant to Part 4 of the Commission's Regulations, 17 C.F.R. pt. 4 (2022).  During the Relevant Period, KEL, as the CPO, failed to deliver to each prospective participant in the Pool with the Disclosure Document required to be delivered pursuant to Regulation 4.21(a)(1), 17 C.F.R. §4.21(a)(1) (2022), by each CPO registered or required to be registered with the Commission, by no later than the time the CPO delivers to the prospective participant a subscription agreement for the Pool.  At no time did KEL deliver a Disclosure Document to any prospective or actual participant in the Pool.

40.     For each of the participants in the Pool, KEL failed to keep and maintain books and records required to be kept and maintained by a CPO pursuant to Regulation 4.22(a), 17 C.F.R. § 4.22(a) (2022), by a CPO registered, or required to be registered, with the Commission, including but not limited to: a Monthly Account Statement, presented in the form of a Statement of Operations and a Statement in Changes in Net Assets.  The purported monthly statements Defendants provided to participants were not presented and computed in accordance with generally accepted accounting principles, as required by 17 C.F.R. § 4.22(a), and further failed to set-forth the information required by 17 C.F.R. § 4.22(a)(1)-(2), including, but not limited to:  (i) the total amount of realized net

gain or loss on commodity interest positions liquidated during the reporting period;

(ii) the change in unrealized net gain or loss on commodity interest positions

during the reporting period; (iii) the total amount of net gain or loss from all other

transactions in which the pool engaged during the reporting period, including

interest and dividends earned on funds not paid as premiums or used to margin the

pool's commodity interest positions; (iv) the total amount of all management fees

during the reporting period; (v) the total amount of all advisory fees during the

reporting period; (vi) the total amount of all brokerage commissions during the

reporting period; (vii) the total amount of other fees for commodity interest and

other investment transactions during the reporting period; and (viii) the total

amount of all other expenses incurred or accrued by the pool during the reporting

period.

41.     The purported monthly statements Defendants sent participants during

the Relevant Period also failed to include an Account Statement that must be

presented in the form of a Statement of Changes in Net Assets, as required by

17 C.F.R. § 4.22(a)(3), including, but not limited to failing to separately itemize

the following information: any material business dealings between the pool, the

pool's operator, commodity trading advisor, futures commission merchant, retail

foreign exchange dealer, swap dealer, or the principals thereof that previously

have not been disclosed in the pool's Disclosure Document or any amendment thereto, other Account Statements or Annual Reports.

42.      KEL failed to keep and maintain books and records required to be kept and maintained by a CPO pursuant to Regulation 4.23(a)-(b), 17 C.F.R. § 4.23(a)-(b) (2022), by a CPO registered, or required to be registered, with the Commission, including but not limited to: (a) concerning the commodity pool: (1) an itemized daily record of each commodity interest transaction of the pool, showing the transaction date, quantity, commodity interest, and, as applicable, price or premium, delivery month or expiration date, whether a put or a call, strike price, underlying contract for future delivery or underlying commodity, swap type and counterparty, the futures commission merchant and/or retail foreign exchange dealer carrying the account and the introducing broker, if any, whether the commodity interest was purchased, sold (including, in the case of a retail forex transaction, offset), exercised, expired (including, in the case of a retail forex transaction, whether it was rolled forward), and the gain or loss realized; (2) a journal of original entry or other equivalent record showing all receipts and disbursements of money, securities and other property; (3) the acknowledgement specified by § 4.21(b) for each participant in the pool; (4) a subsidiary ledger or other equivalent record for each participant in the pool showing the participant's name and address and all funds, securities and other property that the pool received

from or distributed to the participant; (5) adjusting entries and any other records of original entry or their equivalent forming the basis of entries in any ledger; (6) a general ledger or other equivalent record containing details of all asset, liability, capital, income and expense accounts; (7) copies of each confirmation or acknowledgment of a commodity interest transaction of the pool, and each purchase and sale statement and each monthly statement for the pool received from a futures commission merchant, retail foreign exchange dealer or swap dealer; (8) cancelled checks, bank statements, journals, ledgers, invoices, computer generated records, and all other records, data and memoranda prepared or received in connection with the operation of the pool; (9) the original or a copy of each report, letter, circular, memorandum, publication, writing, advertisement or other literature or advice (including the texts of standardized oral presentations and of radio, television, seminar or similar mass media presentations) distributed or caused to be distributed by the commodity pool operator to any existing or prospective pool participant or received by the pool operator from any commodity trading advisor of the pool, showing the first date of distribution or receipt if not otherwise shown on the document; (10) a Statement of Financial Condition as of the close of (i) each regular monthly period if the pool had net assets of $500,000 or more at the beginning of the pool's fiscal year, or (ii) each regular quarterly period for all other pools; (11) a Statement of Income (Loss) for the period

between (i) the later of: (A) the date of the most recent Statement of Financial

Condition furnished to the Commission pursuant to § 4.22(c), (B) or (C) the

formation of the pool, and (ii) the date of the Statement of Financial Condition

required by paragraph (a)(10) of this section; (12) a manually signed copy of each

Account Statement and Annual Report provided pursuant to §§ 4.22, 4.7(b) or

4.12(b), and records of the key financial balances submitted to the National Futures

Association for each commodity pool Annual Report, which records must clearly

demonstrate how the key financial balances were compiled from the Annual

Report; (b) Concerning the commodity pool operator: (1) An itemized daily record

of each commodity interest transaction of the commodity pool operator and each

principal thereof, showing the transaction date, quantity, commodity interest, and,

as applicable, price or premium, delivery month or expiration date, whether a put

or a call, strike price, underlying contract for future delivery or underlying

commodity, swap type and counterparty, the futures commission merchant or retail

foreign exchange dealer carrying the account and the introducing broker, if any,

whether the commodity interest was purchased, sold, exercised, or expired, and the

gain or loss realized; (2) Each confirmation of a commodity interest transaction,

each purchase and sale statement and each monthly statement furnished by a

futures commission merchant or retail foreign exchange dealer to: (i) The

commodity pool operator relating to a personal account of the pool operator; and

(ii) Each principal of the pool operator relating to a personal account of such

principal.  KEL failed to keep and maintain any of these Records during the

Relevant Period.

43.    Defendants did not inquire, and failed to keep or maintain any

records, as to whether a prospective customer was an ECP or about a prospective

participant's savings and investments.

44.    For example, KEL did not inquire or keep any records as to whether a

prospective participant had assets in excess of $5 million, nor did it inquire if the

prospective participant was seeking to engage in forex transactions to manage the

risk of an asset or liability already owned, or about to be owned, by the prospective

participant.

### C.    Failure to Register

46.    Throughout the Relevant Period, KEL acted in a capacity as a CPO by

soliciting, accepting, and receiving funds from the public while engaged in a

business that was, and is, of the nature of an investment trust, syndicate, or similar

form of enterprise, for the purpose of, among other things, trading in commodity

interests, including forex pairs on a leveraged, margined or financed basis with

participants who are not ECPs and forex futures contracts, without being registered

with the Commission as a CPO.  At no time during the Relevant Period did KEL

seek an exemption from the requirement to register with the Commission as a

CPO.  At no time during the Relevant Period did KEL qualify for an exemption

from the requirement to register with the Commission as a CPO.

47.    Throughout the Relevant Period, Foster acted, and continues to act, in

a capacity as an AP of KEL by, in his capacity as a partner, officer, employee,

consultant or agent of the CPO (KEL), soliciting or supervising the solicitation of

funds for participation in the Pool, without being registered with the CFTC as an

AP of a CPO.

### D.    Foster is the Controlling Person of KEL

48.    Throughout the Relevant Period, Foster acted, and continues to act, as

the controlling person of KEL.  Foster was, and is, the President, Vice President,

Treasurer and Secretary of KEL, and solely possessed the power and authority to

control all day-to-day business operations of KEL.  As the primary signatory on

KEL's bank accounts, Foster controlled, and continues to control, all credits and

debits in the KEL bank accounts.  Foster also solely controlled, and continues to

control, all solicitations to actual and prospective participants.

49.    Throughout the Relevant Period, Foster was, and continues to be, the

owner and controlling person of KEL.  Foster was, and continues to be, the sole

Officer, Director and Shareholder of KEL, he solely operated and controlled the

day-to-day operations of KEL's business activities, and he opened and controlled

KEL's bank accounts.  Therefore, Foster was, and continues to be, de facto and de jure solely in charge of the operations of KEL throughout the Relevant Period.

50.     As the controlling person of KEL, Foster was aware of the activities that form the violations of the Act and Regulations set-forth herein.  Further, Foster failed to act in good faith at all times throughout the Relevant Period because he failed to create and/or implement any supervisory controls over the daily operations of KEL throughout the Relevant Period.

## VII.  VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND CFTC REGULATIONS

### COUNT ONE
**Violations of Section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B) (Fraud by a CPO—KEL; Fraud by an AP of a CPO—Foster)**

51.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

52.     A CPO is defined in Section 1a(11) of the Act, 7 U.S.C. § 1a(11), as any person . . . engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts or receives from others, funds, securities, or property either directly or through capital contributions . . . for the purpose of trading in commodity interests, including any . . . agreement, contract, or transaction described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(C)(i).

53.    Throughout the Relevant Period, KEL acted as a CPO by soliciting, accepting or receiving funds from others for the purpose of trading in commodity interests.

54.    An AP of a CPO is defined by Regulation 1.3, 17 C.F.R. § 1.3 (2022), as any person who is associated with a CPO as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves:  (i) the solicitation of funds, securities, or property for a participation in a commodity pool; or (ii) the supervision of any person or persons so engaged.

55.    Throughout the Relevant Period, Foster acted and continues to act as an AP of CPO KEL because while he was an officer, owner and registered agent of KEL, Foster solicited funds and property from pool participants for a participation in Defendants' Pool.

56.    7 U.S.C. § 6o(1)(A)-(B) prohibits CPOs and APs of CPOs, whether registered with the CFTC or not, "by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly . . . "(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant."

57.    Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I), makes forex transactions, agreements, or contracts described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. §2(c)(2)(C)(i), and accounts or pooled investment vehicles described in Section 2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii), "subject to" Section 4*o*, 7 U.S.C. § 6*o*.  Additionally, 7 U.S.C. § 2(c)(2)(C)(vii) states that the CFTC has jurisdiction over an account or pooled investment vehicle that is offered for the purpose of trading forex described in Section 2(c)(2)(C)(i) of the Act.

58.    As alleged herein, Defendants employed or are employing a device, scheme, or artifice to defraud actual and prospective participants or engaged or are engaging in transactions, practices, or a course of business which operated or operates as a fraud or deceit upon any actual or prospective participant, including without limitation:  misappropriation of participants' funds, providing false statements to customers via electronic mail, and misrepresenting and/or omitting material facts in solicitations and communications with participants, all in violation of 7 U.S.C. § 6*o*(1)(A)-(B).

59.    The foregoing acts, omissions, and failures by Foster occurred within the scope of his employment, agency, or office with KEL during the Relevant Period.  Therefore, KEL is liable for Foster's violations of 7 U.S.C. § 6*o*(1)(A)-(B) pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation

1.2, 17 C.F.R. § 1.2 (2022).

60.    During the Relevant Period, Foster holds and exercises direct and indirect control over KEL's daily business operations and either did not act in good faith or knowingly induced KEL's violations of 7 U.SC. § 6*o*(1)(A)-(B).  As a controlling person of KEL, Foster is liable for KEL's violations of 7 U.S.C. § 6*o*(1)(A)-(B), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

61.    Each omission of material fact, false statement, act of misappropriation, employment of a device, scheme, or artifice to defraud, and transaction, practice, or course of business which operated as a fraud or deceit made during the Relevant Period, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A)-(B).

## COUNT TWO
### Violations of Regulation 4.20(a)(1), (b) and (c),
### 17 C.F.R. § 4.20(a)(1), (b), (c) (2022)
### (Failure to Operate Commodity Pool as a Separate Legal Entity, Failure to Receive Funds in the Pool's Name, and Commingling of Pool Funds—All Defendants)

62.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

63.    17 C.F.R. § 4.20(a)(1) requires a CPO to operate his or her commodity pool as an entity cognizable as a legal entity separate from that of the

pool operator, with certain specified exceptions not applicable here.

64.    Throughout the Relevant Period, KEL, while acting as a CPO,
violated 17 C.F.R. § 4.20(a)(1) by failing to operate the commodity pool as a legal
entity separate from itself.

65.    17 C.F.R. § 4.20(b) provides:  "All funds, securities or other property
received by a commodity pool operator from an existing or prospective pool
participant for the purchase of an interest or as an assessment (whether voluntary
or involuntary) on an interest in a pool that it operates or that it intends to operate
must be received in the pool's name."

66.    During the Relevant Period, KEL, while acting as a CPO, violated
17 C.F.R. § 4.20(b) by receiving funds from existing or prospective pool
participants for the purchase of an interest in the Pool without receiving the same
in the Pool's name.

67.    17 C.F.R. § 4.20(c) provides: "No commodity pool operator may
commingle the property of any pool that it operates or that it intends to operate
with the property of any other person."

68.    During the Relevant Period, KEL, while acting as a CPO, violated 17
C.F.R. § 4.20(c) by commingling pool funds with the personal funds of Foster.

69.    Foster held and exercised direct and indirect control over KEL's daily
business operations and either did not act in good faith or knowingly induced

KEL's violations of 17 C.F.R. § 4.20(a)(1), (b), and (c) during the Relevant Period. As a controlling person of KEL, Foster is liable for KEL's violations of 17 C.F.R. § 4.20(a)(1), (b), and (c) pursuant to 7 U.S.C. § 13c(b).

**COUNT THREE**
**Violations of Sections 2(c)(2)(C)(iii)(I)(cc), 4m(1), and 4k(2) of the Act,**
**7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), 6k(2), and Regulations 5.3(a)(2)(i)**
**and (ii), 17 C.F.R. § 5.3(a)(2)(i), (ii) (2022)**
**(Failure to Register as a CPO—KEL; Failure to Register as an AP of a**
**CPO—Foster)**

70.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

71.     7 U.S.C. § 6m(1) makes it unlawful for any CPO, unless registered with the CFTC, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO.  Similarly, 17 C.F.R. § 5.3(a)(2)(i) requires anyone acting as a CPO for a pooled investment vehicle that engages in retail forex transactions to register as a CPO.

72.     Subject to certain exceptions not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) states in part, that:

> A person, unless registered in such capacity as the Commission by rule, regulation, or order shall determine and a member of a futures association registered under section 17, shall not . . .

. . . .

> (cc) operate or solicit funds, securities, or property for any pooled investment vehicle that is not an eligible contract participant in connection with [applicable retail forex agreements, contracts, or transactions].

73.     Except in circumstances not relevant here, 7 U.S.C.

§ 2(c)(2)(C)(iii)(I)(cc) and 17 C.F.R. § 5.3(a)(2)(i) require those that meet the

definition of a retail forex CPO under 17 C.F.R. § 5.1(d)(1) to register as a CPO

with the Commission.

74.     During the Relevant Period, KEL acted as a CPO by engaging in a

business that was in the nature of a commodity pool, investment trust, syndicate, or

similar enterprise, and in connection therewith, solicited, accepted, or received

from others, funds, securities, or property, either directly or otherwise, for the

purpose of trading in forex futures contracts and off-exchange leveraged, margined

or financed forex transactions, while failing to register with the Commission as a

CPO in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and 17 C.F.R.

§ 5.3(a)(2)(i).  During the Relevant Period, KEL was not exempt from registration

as a CPO.

75.     7 U.S.C. § 6k(2) makes it unlawful for any person to be associated

with a CPO as an officer or agent (or any person occupying a similar status or

performing similar functions), in any capacity that involves the solicitation of

funds, securities, or property for participation in a commodity pool, unless such

person is registered with the Commission as an AP of a CPO.  Similarly, 17 C.F.R.

§ 5.3(a)(2)(ii) requires anyone acting as an AP of a CPO for a pooled investment

vehicle that engages in retail forex transactions to register as an AP.

76.    Except in certain circumstances not relevant here, 7 U.S.C.
§ 2(c)(2)(C)(iii)(I)(cc) and 17 C.F.R. § 5.3(a)(2)(ii) require those that meet the
definition of an AP of a retail forex CPO under 17 C.F.R. § 5.1(d)(2) to register as
an AP of a CPO with the Commission.

77.    Throughout the Relevant Period, Foster was associated with CPO
KEL as an officer or agent in a capacity that involved the solicitation of funds,
securities, or property for participation in a commodity pool, while failing to
register with the Commission as an AP of the CPO KEL in violation of 7 U.S.C.
§§ 2(c)(2)(C)(iii)(I)(cc), 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii).  Throughout the
Relevant Period, Foster was not exempt from the requirement to register as an AP
of a CPO.

78.    The foregoing acts, omissions, and failures by Foster occurred within
the scope of his employment, agency, or office with KEL during the Relevant
Period.  Therefore, KEL is liable for Foster's violations of 7 U.S.C.
§§ 2(c)(2)(C)(iii)(I)(cc), 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii), pursuant to 7 U.S.C.
§ 2(a)(1)(B) and 17 C.F.R. § 1.2.

79.    Foster held and exercised direct and indirect control over KEL and
either did not act in good faith or knowingly induced KEL's violations of 7 U.S.C.
§§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i) during the Relevant
Period.  As a controlling person of KEL, Foster is liable for KEL's violations of 7

U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i), pursuant to

7 U.S.C. § 13c(b).

80.     Each instance during the Relevant Period in which KEL acted as an

unregistered CPO, including but not limited to those specifically alleged herein, is

alleged as a separate and distinct violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc),

6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

81.     Each instance during the Relevant Period in which Foster acted as an

AP of KEL, including but not limited to those specifically alleged herein, is alleged

as a separate and distinct violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2) and

17 C.F.R. § 5.3(a)(2)(ii).

**COUNT FOUR**
**Violations of Regulations 4.21, 4.22 and 4.23,**
**17 C.F.R. §§ 4.21-4.23 (2022)**
**(Failure to Keep and Maintain Required Books and Records–All Defendants)**

82.     The allegations set forth in the preceding paragraphs are re-alleged

and incorporated herein by reference.

83.     17 C.F.R. §§ 4.21 through 4.23, in relevant part, require that each

CPO registered with the Commission, or required to be registered with the

Commission, keep and maintain the books and records in an accurate, current and

orderly manner, including without limitation, Disclosure Documents, Account

Statements, and Statements of Operations.

84.     As set forth above, during the Relevant Period, KEL acted as an unregistered CPO by soliciting and accepting funds from U.S. resident non-ECPs for a participation percentage in a Pool operated by KEL.  Throughout the Relevant Period, Foster was associated with CPO KEL as an officer or agent in a capacity that involves the solicitation of funds, securities, or property for participation in a commodity pool, while failing to register with the Commission as an AP of the CPO KEL, and controlled KEL's daily business operations.

85.     At no time during the Relevant Period did KEL in accordance with 17 C.F.R. §§ 4.21-4.23, keep and maintain the books and records identified herein, and/or in the required format, in violation of 17 C.F.R. §§ 4.21-4.23.

86.     Each day during the Relevant Period in which KEL failed to maintain, in accordance with 17 C.F.R. §§ 4.21-4.23, the required books and records, is alleged as a separate and distinct violation of 17 C.F.R. §§ 4.21-4.23.

87.     Throughout the Relevant Period, Foster directly or indirectly controlled KEL and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting KEL's violations of 17 C.F.R. §§ 4.21-4.23. Therefore, pursuant to 7 U.S.C. § 13c(b), Foster is liable as a controlling person for each of KEL's violations of 17 C.F.R. §§ 4.21-4.23.

## VIII.  <u>RELIEF REQUESTED</u>

WHEREFORE, the Commission respectfully requests that this Court, as authorized by 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A.      An order finding that Defendants violated and are violating Sections 2(c)(2)(C)(iii)(I)(cc), 4k(2), 4m(1), and 4*o*(1)(A)-(B) Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2), 6m(1), 6*o*(1)(A)-(B), and Regulations 4.20(a)(1), (b), and (c), 4.21-4.23, and 5.3(a)(2)(i) and (ii), 17 C.F.R. §§ 4.20(a)(1), (b), (c), 4.21-4.23, 5.3(a)(2)(i), (ii) (2022);

B.      An order of permanent injunction restraining, enjoining and prohibiting Defendants and any other person or entity in active concert with them, from engaging in conduct in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2), 6m(1), and 6*o*(1)(A)-(B), and 17 C.F.R. §§ 4.20(a)(1), (b), (c), 4.21-4.23, 5.3(a)(2)(i) and (ii);

C.      An order of permanent injunction prohibiting Defendants and any other person or entity in active concert with them from, directly or indirectly:

   1)  Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

   2)  Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022)), for

accounts held in the name of Defendants or for accounts in which

Defendants have a direct or indirect interest;

3) Having any commodity interests traded on Defendants' behalf;

4) Controlling or directing the trading for, or on behalf of any other

person or entity, whether by power of attorney or otherwise, in any

account involving commodity interests;

5) Soliciting, receiving, or accepting any funds from any person for

the purpose of purchasing or selling of any commodity interests;

6) Applying for registration or claiming exemption from registration

with the CFTC in any capacity, and engaging in any activity

requiring such registration or exemption from registration with the

Commission, except as provided for in Regulation 4.14(a)(9),

17 C.F.R. § 4.14(a)(9) (2022); and

7) Acting as a principal (as that term is defined in Regulation 3.1(a),

17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or employee

of any person registered, exempted from registration, or required to

be registered with the Commission except as provided for in 17

C.F.R. § 4.14(a)(9) (2022);

D.    An order requiring Defendants, as well as any successors thereof, to

disgorge, pursuant to such procedures as the Court may order, all benefits received

including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including post-judgment interest;

E.      An order requiring Defendants, as well as any successors thereof, to make full restitution, pursuant to such procedures as the Court may order, to every person or entity who sustained losses proximately caused by Defendants' violations described herein, including post-judgment interest;

F.      An order directing Defendants, as well as any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the participants whose funds were received by Defendants as a result of the acts and practices that constituted violations of the Act and Regulations, as described herein;

G.      An order directing Defendants, as well as any successors thereof, to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by 7 U.S.C. § 13a-1(d)(1)), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* 17 C.F.R.

§ 143.8 (2022), or subsequent annually adjusted amounts, for each violation of the

Act and Regulations, as described herein;

      H.     An order directing that Defendants, and any successors thereof, make

an accounting to the Court of all of their assets and liabilities, together with all

funds they received from and paid to participants and other persons in connection

with commodity interests and all disbursements for any purpose whatsoever of

funds received from commodity interests, including salaries, commissions, interest,

fees, loans, and other disbursement of money or property of any kind from at least

January 1, 2017 to the date of such accounting;

      I.     An order requiring Defendants, and any successors thereof, to pay

costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2); and

      J.     Such other and further relief as this Court may deem necessary and

appropriate under the circumstances.


Dated:  June 28, 2023             Respectfully submitted,

                          By: /s/ Kassra Goudarzi
                          Kassra Goudarzi
                          (DC Bar No. 490709)
                          Senior Trial Attorney
                          kgoudarzi@cftc.gov
                          (202) 418-5416

                          Timothy J. Mulreany
                          (MD Bar No. 8812160123)
                          Chief Trial Attorney
                          tmulreany@cftc.gov
                          (202) 418-5306

Paul G. Hayeck
(MA Bar No. 554815)
Deputy Director
phayeck@cftc.gov
(202) 418-5312

Commodity Futures Trading
Commission
Division of Enforcement
1155 21st Street, NW
Washington, DC 20581

**ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION**


Counsel to Receive Notice

Kevin Erskine
Assistant United States Attorney
Civil Division Chief
Office of the United States Attorney
Eastern District of Michigan
211 West Fort Street
Suite 2001
Detroit, Michigan 48226
kevin.erskine@usdoj.gov
(313) 226-9100