# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

**COMMODITY FUTURES TRADING COMMISSION,**

Plaintiff,

v.

**DWIGHT A. FOSTER, and
K.E.L. ENTERPRISES, INC.,**

Defendants.

Case No. 2:23-cv-11552-SFC-EAS

## CONSENT ORDER FOR PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANTS DWIGHT A. FOSTER AND K.E.L. ENTERPRISES, INC.

On June 28, 2023, Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission") filed its Complaint (ECF No. 1) against Dwight A. Foster ("Foster") and K.E.L. Enterprises, Inc. ("KEL") (collectively, "Defendants") seeking injunctive and other equitable relief and civil monetary penalties for violations of the Commodity Exchange Act ("Act" or "CEA"), 7 U.S.C. §§ 1–26, and the Commission Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1–190 (2022).

## I.   CONSENTS AND AGREEMENTS

To effect partial settlement of all charges alleged in the Complaint against Defendants, without a trial on the merits or any further judicial proceedings, Foster and KEL:

1.      Consent to the entry of this Consent Order for Permanent Injunction and Other Statutory and Equitable Relief Against Defendants Dwight A. Foster and K.E.L. Enterprises, Inc. ("Consent Order");

2.      Affirm that they have read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the Commission or any member, officer, agent, or representative thereof, or by any other person, to induce consent to this Consent Order;

3.      Acknowledge service of the summons and Complaint;

4.      Admit the jurisdiction of this Court over them and the subject matter of this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), and 28 U.S.C. §§ 1331, 1345;

5.      Admit the jurisdiction of the Commission over the conduct and transactions at issue in this action pursuant to the Act;

6.      Admit that venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e);

2

7.   Waive:

    (a)   Any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2022), relating to, or arising from, this action;

    (b)   Any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–253, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this action;

    (c)   Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

    (d)   Any and all rights of appeal from this action;

8.   Acknowledge that the Commission is the prevailing party in this action for purposes of the waiver of any and all rights under the Equal Access to Justice Act and the Small Business Regulatory Enforcement Fairness Act of 1996 specified in subparts (a) and (b) of paragraph 7 above;

9.   Consent to the continued jurisdiction of this Court over them for the purpose of implementing and enforcing the terms and conditions of all orders and decrees, including orders setting the appropriate amounts of restitution, disgorgement and civil monetary penalty, that may be entered herein, to entertain any suitable application or motion for additional relief within the jurisdiction of the Court, to assure compliance with this Consent Order and for any other purpose

relevant to this action, even if Foster or KEL now or in the future reside outside the jurisdiction of this Court;

10.     Agree that they will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and hereby waive any objection based thereon;

11.     Agree that neither they, nor any of their agents or employees under their authority or control, shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect their:  (a) testimonial obligations, or (b) right to take legal positions in other proceedings to which the Commission is not a party.  Defendants shall comply with this agreement, and shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement;

12.     Consent to the entry of this Consent Order without admitting or denying the allegations of the Complaint or the findings or conclusions in this Consent Order, except as to jurisdiction and venue, which they admit;

13.     Consent to the use of the findings and conclusions in this Consent Order in this proceeding and in any other proceeding brought by the Commission

or to which the Commission is a party or claimant, and agree that they shall be taken as true and correct and be given preclusive effect therein, without further proof;

14.     Do not consent, however, to the use of this Consent Order, or the findings and conclusions herein, as the sole basis for any other proceeding brought by the Commission or to which the Commission is a party, other than: a statutory disqualification proceeding; a proceeding in bankruptcy, or receivership; or a proceeding to enforce the terms of this Order;

15.     Agree to provide immediate notice to this Court and the Commission by certified mail, in the manner required by paragraph 105 of Section V of this Consent Order, of any bankruptcy proceeding filed by, on behalf of, or against them, whether inside or outside the United States; and

16.     Agree that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Defendants in any other proceeding;

17.     Consent to pay restitution, plus post-judgment interest, in an amount to be determined upon subsequent consent order or motion by the Commission and/or hearing before this Court;

18.     Consent to pay disgorgement, plus post-judgment interest, in an amount to be determined upon subsequent consent order or motion by the Commission and/or hearing before this Court; and

19.     Consent to pay a civil monetary penalty, plus post-judgment interest, in an amount to be determined upon subsequent consent order or motion by the Commission and/or hearing before this Court.

## II.     FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay.  The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction, and equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, as set forth herein.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS:**

**A.     Findings of Fact**

    **1.     <u>Parties to This Consent Order</u>**

20.     Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and Regulations.

21.     Defendant Dwight A. Foster is a dual citizen of the United States and Canada.  Foster's last known residence is in West Bloomfield, Michigan.  Foster

holds himself out as the President and CEO of KEL.  Foster has never been
registered with the Commission in any capacity.

22.     Defendant K.E.L. Enterprises, Inc. is a company organized and
operated pursuant to the laws of the State of Michigan on or about November 19,
1984.  Foster is identified in the records of the Michigan Secretary of State,
Corporations Division, as the President, Vice President, Treasurer and Secretary of
KEL, as well as its registered agent.  The records of the Michigan Secretary of
State, Corporations Division, identifies KEL's principal place of business as
located in West Bloomfield, Michigan.  KEL has never been registered with the
Commission in any capacity.

**2.    Related Entities**

23.     The QYU Holdings Inc. is a corporation organized and operated
pursuant to the laws of the State of Wyoming, with its principal place of business
in Dallas, Texas.  It is owned by third parties not named in this Consent Order.
The QYU Holdings Inc. has never been registered with the Commission in any
capacity.

24.     QYU Holdings Corporation is a corporation organized and operated
pursuant to the laws of the Republic of Panama.  It is owned by third parties not
named in this Consent Order.  QYU Holdings Corporation was registered with the
Commission as a commodity trading advisor ("CTA") on December 30, 2013; that

registration was withdrawn on March 7, 2018. QYU Holdings Corporation was registered with the Commission as a commodity pool operator ("CPO") on September 11, 2015; that registration was withdrawn on March 7, 2018. QYU Holdings Corporation has not been registered with the Commission in any capacity since March 7, 2018.

25.     QYU Holdings Limited LLC is a corporation organized and operated pursuant to the laws of Florida. It is owned by third parties not named in this Consent Order. QYU Holdings Limited LLC has never been registered with the Commission in any capacity.

**3.     Summary**

26.     From at least January 1, 2017 to the present (the "Relevant Period"), Dwight A. Foster ("Foster"), and K.E.L. Enterprises, Inc. ("KEL"), (collectively, the "Defendants"), engaged in a multimillion-dollar fraudulent scheme through which they solicited not less than $13.2 million from at least 45 members of the public to participate in a commodity pool operated by Foster and KEL ("commodity pool" or "Pool"), for the purpose of trading in commodity interests, including foreign currency ("forex") pairs on a leveraged, margined or financed basis with participants who are not eligible contract participants ("ECPs") and forex futures contracts.

27.     Instead of trading pool participants' funds as promised, Defendants misappropriated all of the pool participants' funds by depositing them directly into Defendants' corporate bank accounts, rather than depositing the funds directly into an account carried in the name of the Pool at a Futures Commission Merchant ("FCM") and/or a retail foreign exchange dealer ("RFED").  Defendants misappropriated, and continue to misappropriate, participants' funds to pay Fosters' personal expenses, including, but not limited to: car payments, insurance, credit cards payments, and other daily living expenses.  Additionally, Defendants used not less than $10.1 million of later-in-time participants' funds to pay earlier-in-time participants purported "profits" and/or "redemptions" in the nature of a Ponzi scheme.

28.     Defendants took steps to conceal their fraud by, among other things, sending pool participants false monthly account statements which purported to show that Defendants' Pool consistently traded at a profit each month during the Relevant Period.

29.     Throughout the Relevant Period, while operating a business that is of the nature of a commodity pool, Defendants used the Internet, interstate wires, and other means or instrumentalities of interstate commerce, directly or indirectly, to employ a device, scheme, or artifice to defraud existing and prospective participants, and to engage in transactions, practices, or a course of business that

operated as a fraud or deceit upon existing and prospective participants.  Foster,

individually and as the agent of KEL, made, and/or continues to make, fraudulent

omissions of material facts in solicitations to actual and prospective pool

participants and in monthly account statements to actual participants, including but

not limited to failing to disclose that:  (1) Defendants never traded pool participant

funds as promised; (2) Defendants did not open forex trading accounts in the name

of the Pool with any lawfully operating commodity exchange, or with any

registered FCM or RFED; (3) Defendants misappropriated, and are continuing to

misappropriate, participants' funds; (4) the monthly "statements" Defendants sent

to participants showing purported monthly profits were false, created by Foster,

and not reflective of actual trading; (5) KEL was unlawfully acting, and continues

to unlawfully act, as an unregistered CPO; and (6) Foster is unlawfully acting, and

continues to unlawfully act, as an unregistered associated person ("AP") of a CPO.

30.    Throughout the Relevant Period, KEL acted at all times, and

continues to act, as a CPO without being registered with the Commission.

Throughout the Relevant Period, Foster acted at all times, and continues to act, as

an AP of a CPO without being registered with the Commission.  At no time during

the Relevant Period did KEL keep and maintain the records required to be kept and

maintained by a CPO, in violation of Regulations 4.21-4.23, 17 C.F.R. §§ 4.21-

4.23 (2022).

4.      **Defendants' Solicitations to Participants**

31.     Beginning in January 2017, Foster has solicited members of the public

to participate in a commodity pool purportedly operated KEL, for the purpose of

trading in commodity interests, including forex currency pairs on a leveraged,

margined or financed basis and forex futures contracts.  Foster targeted the

solicitations to participants who were not ECPs, and who were generally not

sophisticated financially.  Many of the individuals who were solicited by Foster,

and who ultimately become participants in Defendants' Pool, were friends and

family members of Foster and had little to no experience trading forex or

commodity interests.

32.     Throughout the Relevant Period, Foster solicited current and

prospective pool participants through direct, person-to-person solicitations, and

recommendations from current pool participants.  As part of the solicitation

process, Defendants provided actual and prospective pool participants with written

solicitation materials from QYU Holdings Corporation, which was described in the

solicitation materials as "a boutique professional trading firm which specializes in

the commodities and foreign exchange market."

33.     Foster represented to actual and prospective pool participants that

KEL pooled participants' funds at a trading account in the name of KEL at QYU

Holdings Corporation.  However, such representations were false because no

participant funds were sent by Defendants to a bank account carried in the name of

QYU Holdings Corporation or traded in a pool operated by Defendants or QYU

Holdings Corporation.  Although some pool participants' funds were ultimately

transferred from Defendants' bank accounts to other QYU entities' bank accounts,

none of the funds were used to trade forex on behalf of pool participants.

34.    Throughout the Relevant Period, Foster, individually and as the agent

of KEL, provided written solicitation material from QYU Holdings Corporation to

actual and prospective participants that touted its trading experience and the "QYU

Edge." For example, the solicitation material stated:

> QYU's strength in trading, or QYU's "Edge," is built on our
> exceptional understanding and analysis of the nuances of the US
> economy and our expert skill in dealing with financial markets…To
> summarize, the majority of our trades involve pairing the US Dollar
> with one of the seven major currencies.

> The average person does not understand the great influence that trade
> agreements have on the world's countries because only an elite few benefit
> directly from those trade relationships.  Those elite few may argue that the
> masses also gain a benefit from these agreements, but those benefits are only
> through ancillary effects.

> Part of our success in the foreign currency markets comes from our ability to
> understand and analyze all of these economic components and relationships.
> The other part of our success comes from our trading skill which is based on
> our expert understanding of market behavior.

35.    Foster, individually and as the agent of KEL, also represented to

actual and prospective participants that their funds were pooled with the funds of

other participants in a KEL Pool purportedly carried at QYU Holdings Corporation

in the "KEL Corporate - QYU Holdings Account," the "KEL Corporate QYU

Account," or the "KEL Corporate-QYU Holdings Vader Account." These

representations were false.

36.    Defendants never operated a commodity pool as an entity cognizable

as a separate legal entity at any registered FCM or RFED. QYU Holdings

Corporation never operated a commodity pool at any registered FCM or RFED,

and Defendants never transferred participant funds from their bank accounts to any

commodity interest trading account. There are no commodity interest accounts

operated or controlled by Defendants at any registered FCM and/or RFED.

37.    Once pool participants decided to participate in Defendants' Pool,

they were given "promissory notes" from KEL, which were signed by Foster as the

agent of KEL. The "promissory notes" promised a return of the pool participant's

principal investment amount plus "seventy percent of any profits attributable to the

management of the borrowed funds." Defendants further represented that the

funds would be transferred into a pooled investment vehicle "to be managed

accordingly." For example, at least one promissory note stated:

> The borrowed funds will be placed into KEL's Corporate – QYU
> Holdings – Vader Account, to be managed accordingly. A monthly
> account statement will be provided to the Borrower, indicating the
> status of the Borrower's Promissory Note Account.

**5.   False Statements**

38.   After accepting participants' funds, Defendants sent pool participants monthly statements which falsely showed each pool participant's "Monthly/YTD (year to date) Account Balances and Dividend Results, for [their] pro-rate share" in Defendants' Pool.  The statements referred to various accounts supposedly held at QYU Holdings Corporation, including the "KEL Corporate - QYU Holdings Account," the "KEL Corporate QYU Account," or the "KEL Corporate-QYU Holdings Vader Account."  These statements were false.  There were no such accounts.

39.   These pooled accounts were purportedly held at QYU Holdings Corporation.  Defendants represented to participants that their funds were pooled in these accounts, which were purportedly then traded on behalf of the Pool by QYU Holdings Corporation.  These statements, sent to participants through interstate commerce, purported to show that Defendants' Pool traded at a profit each month during the Relevant Period.  These statements were false, and no trading took place on behalf of the pool participants.

**6.   Omissions of Material Facts**

40.   In furtherance of the fraudulent scheme, Foster, individually and as the agent of KEL, made fraudulent omissions of material facts in solicitations to actual and prospective pool participants, including but not limited to, failing to

disclose that:  Defendants were misappropriating participants' funds; Defendants were using later-in-time participants' funds to pay purported "profits" and/or "redemptions" to earlier-in-time participants, in the nature of a "Ponzi" scheme; Defendants were not registered with the Commission as CPOs, APs of CPOs, or in any other capacity; there was no "KEL Corporate - QYU Holdings Account," "KEL Corporate QYU Account," or "KEL Corporate-QYU Holdings Vader Account" into which participants funds were traded on behalf of the Pool; participants' funds are not used for trading forex futures contracts on any lawfully operating exchange; participants' funds were not used for trading forex currency pairs on a leveraged, margined or financed basis, with any registered FCM or RFED; guaranteed return promises were fraudulent as a matter of law given the volatility of the forex market; and, the monthly "statements" Defendants send to participants showing monthly profits were created by Foster and not reflective of actual trading.

41.    Defendants' omissions of facts were, and are, material.  Defendants failed to advise participants that at no time throughout the Relevant Period did Defendants transfer any participant funds to a commodity pool trading account or bank account in the name of QYU Holdings Corporation, or to any commodity trading account carried in the name of a CPO and/or RFED registered with the Commission.  Rather than have participants send their funds directly to an FCM

and/or RFED carrying a forex trading account in the name of the Pool, Defendants accepted participants' funds by depositing them into a bank account ending in *4991 carried in the name of KEL at J.P. Morgan Chase ("JPMC account"). The funds were then transferred by Defendants to a bank account ending in *4708 carried in the name of The QYU Holdings Inc. at Bank of America ("BOA account"). Foster was, and remains, the primary signatory on the JPMC account.

42.    For example, between March 16, 2021 to April 7, 2021, Defendants accepted $1,036,000 sent by pool participants for the purpose of participating in Defendants' purported forex trading pool. On March 16, 2021, Defendants deposited into the KEL JPMC account $1,000,000 accepted from a participant for the purpose of purchasing a participation in Defendants' purported Pool. On March 29, 2021, Foster wired $500,000 of these funds from the KEL JPMC account to The QYU Holdings Inc.'s BOA account. On March 30, 2021, Foster wired the remaining $500,000 from the KEL JPMC account to The QYU Holdings Inc.'s BOA account. During the period March 29, 2021 to April 7, 2021, The QYU Holdings Inc. BOA account received an additional $150,000 from the KEL JPMC account—all funds from pool participants.

43.    All of these funds were misappropriated. During the period March 30, 2021 to April 7, 2021, The QYU Holdings Inc. BOA account returned $74,000 to the KEL JPMC account. Defendants fraudulently used these returned pool

participant funds to pay $1,006,676 to earlier-in-time participants in the form of purported "redemptions." Because Defendants did not actually operate a forex trading pool on behalf of pool participants, the "redemption" payments were actually Ponzi-like scheme payments made from funds Defendants obtained from later-in-time pool participants.

44.     In addition, The QYU Holdings Inc. BOA account records show that during this period, $108,000 was transferred to QYU Technologies Corp. in the Republic of Panama, $74,000 to Defendants, and additional payments totaling $398,348 to third parties unassociated with any forex trading activity. None of the funds that were originally transferred from the KEL JPMC account to The QYU Holdings Inc. BOA account, and back again, were deposited into a Pool trading account or used for trading forex or commodity interests on behalf of pool participants.

45.     Throughout the Relevant Period, Defendants commingled participants' funds with third party funds by accepting participants' funds into bank accounts which were carried in the name of KEL, and controlled by Foster. Defendants subsequently transferred participants' funds into bank accounts of third parties, unrelated to Defendants' Pool. At no time during the Relevant Period did Defendants deposit participant funds into an account carried in the name of the Pool at a registered FCM or RFED.

46.     For example, Foster, as the person in control of the KEL JPMC
account, misappropriated, and subsequently transferred the following participant
funds: $779,129.81 to a bank account at TD Bank Toronto carried in the name of
QYU Holdings, Ltd.; $6,745,065.37 to The QYU Holdings Inc. BOA account;
$1,035,975.00 to a bank account at JPMC ending in *6519; and $2,851,616.38 to a
bank account at BOA ending in *5733 carried in the name of The QYU Holdings
Inc. None of these funds transferred by Defendants were deposited into a Pool
trading account or used for trading forex or commodity interests on behalf of
participants.

**7.      Failure to Make Disclosures and to Keep and Maintain Required
          Books and Records**

47.     Throughout the Relevant Period, KEL, as the CPO, failed to keep and
maintain books and records required to be maintained by a CPO pursuant to Part 4
of the Commission's Regulations, 17 C.F.R. pt. 4 (2022). During the Relevant
Period, KEL, as the CPO, failed to deliver to each prospective participant in the
Pool with the Disclosure Document required to be delivered pursuant to Regulation
4.21 (a)(1), 17 C.F.R. §4.21(a)(1) (2022), by each CPO registered or required to be
registered with the Commission, by no later than the time the CPO delivers to the
prospective participant a subscription agreement for the Pool. At no time did KEL
deliver a Disclosure Document to any prospective or actual participant in the Pool.

48.     For each of the participants in the Pool, KEL failed to keep and maintain books and records required to be kept and maintained pursuant to Regulation 4.22(a), 17 C.F.R. § 4.22(a) (2022), by a CPO registered, or required to be registered, with the Commission, including but not limited to, a Monthly Account Statement, presented in the form of a Statement of Operations and a Statement in Changes in Net Assets.  The purported monthly statements Defendants provided to participants were not presented and computed in accordance with generally accepted accounting principles, as required by 17 C.F.R. § 4.22(a), and further failed to set-forth the information required by 17 C.F.R. § 4.22(a)(1)–(2).

49.     The purported monthly statements Defendants sent participants during the Relevant Period also failed to include an Account Statement that must be presented in the form of a Statement of Changes in Net Assets, as required by 17 C.F.R. § 4.22(a)(3) (2022), including, but not limited to failing to separately itemize the following information: any material business dealings between the pool, the pool's operator, commodity trading advisor, futures commission merchant, retail foreign exchange dealer, swap dealer, or the principals thereof that previously have not been disclosed in the pool's Disclosure Document or any amendment thereto, other Account Statements or Annual Reports.

50.    KEL also failed to keep and maintain books and records required to be kept and maintained by a CPO pursuant to Regulation 4.23(a)–(b), 17 C.F.R. § 4.23(a)–(b) (2022), by a CPO registered, or required to be registered, with the Commission, including but not limited to, all transactions of the pool.

51.    Defendants did not inquire, and failed to keep or maintain any records, as to whether a prospective customer was an ECP or about a prospective participant's savings and investments.

52.    For example, KEL did not inquire or keep any records as to whether a prospective participant has assets in excess of $5 million, nor did it inquire if the prospective participant was seeking to engage in forex transactions to manage the risk of an asset or liability already owned, or about to be owned, by the prospective participant.

**8.    <u>Failure to Register</u>**

53.    Throughout the Relevant Period, KEL acted in a capacity as a CPO by soliciting, accepting, and receiving funds from the public while engaged in a business that was, and is, of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of, among other things, trading in commodity interests, including forex pairs on a leveraged, margined or financed basis with participants who are not ECPs and forex futures contracts, without being registered with the Commission as a CPO.  At no time during the Relevant Period did KEL

20

seek an exemption from the requirement to register with the Commission as a CPO.  At no time during the Relevant Period did KEL qualify for an exemption from the requirement to register with the Commission as a CPO.

54.    Throughout the Relevant Period, Foster acted, and continues to act, in a capacity as an AP of KEL by, in his capacity as a partner, officer, employee, consultant or agent of the CPO (KEL), soliciting or supervising the solicitation of funds for participation in the Pool, without being registered with the Commission as an AP of a CPO.

### 9.    Foster is the Controlling Person of KEL

55.    Throughout the Relevant Period, Foster acted, and continues to act, as the controlling person of KEL.  Foster was, and is, the President, Vice President, Treasurer and Secretary of KEL, and solely possessed the power and authority to control all day-to-day business operations of KEL.  As the primary signatory on KEL's bank accounts, Foster controlled, and continues to control, all credits and debits in the KEL bank accounts.  Foster also solely controlled, and continues to control, all solicitations to actual and prospective participants.

56.    Throughout the Relevant Period, Foster was, and continues to be, the owner and controlling person of KEL.  Foster was, and continues to be, the sole Officer, Director and Shareholder of KEL, he solely operated and controlled the day-to-day operations of KEL's business activities, and he opened and controlled

21

KEL's bank accounts.  Therefore, Foster was, and continues to be, de facto and de jure solely in charge of the operations of KEL throughout the Relevant Period.

57.     As the controlling person of KEL, Foster was aware of the activities that form the violations of the Act and Regulations set-forth herein.  Further, Foster failed to act in good faith at all times throughout the Relevant Period because he failed to create and/or implement any supervisory controls over the daily operations of KEL throughout the Relevant Period.

## B.     Conclusions of Law

### 1.     Jurisdiction and Venue

58.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. §13a-1(a), provides that district courts have jurisdiction to hear actions brought by the Commission for injunctive relief or to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in, an act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

59.    Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants transacted business in the Eastern District of Michigan, and certain transactions, acts, and practices alleged in this Complaint occurred within this District.

**2.    Fraud by a CPO (KEL) and Fraud by an AP of a CPO (Foster)**

60.    A CPO is defined in Section 1a(11) of the Act, 7 U.S.C. § 1a(11), as any person . . . engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts or receives from others, funds, securities, or property either directly or through capital contributions . . . for the purpose of trading in commodity interests, including any . . . agreement, contract, or transaction described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(C)(i).

61.    Throughout the Relevant Period, KEL acted as a CPO by soliciting, accepting or receiving funds from others for the purpose of trading in commodity interests.

62.    An AP of a CPO is defined by Regulation 1.3, 17 C.F.R. § 1.3 (2022), as any person who is associated with a CPO as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds,

securities or property for a participation in a commodity pool or (ii) the supervision

of any person or persons so engaged.

63.     Throughout the Relevant Period, Foster acted and/or continues to act

as an AP of CPO KEL because while he was an officer, owner and registered agent

of KEL, Foster solicited funds and property from pool participants for a

participation percentage in Defendants' Pool.

64.     Section 4$o$(1)(A)-(B) of the Act, 7 U.S.C. § 6$o$(1)(A)-(B), prohibits

CPOs and APs of CPOs, whether registered with the CFTC or not, "by use of the

mails or any means or instrumentality of interstate commerce, directly or indirectly

. . . "(A) to employ any device, scheme, or artifice to defraud any client or

participant or prospective client or participant; or (B) to engage in any transaction,

practice, or course of business which operates as a fraud or deceit upon any client

or participant or prospective client or participant."

65.     Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I), makes

forex transactions, agreements, or contracts described in Section 2(c)(2)(C)(i) of

the Act, 7 U.S.C. §2(c)(2)(C)(i), and accounts or pooled investment vehicles

described in Section 2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii), "subject

to" Section 4$o$, 7 U.S.C. § 6$o$.  Additionally, 7 U.S.C. § 2(c)(2)(C)(vii) states that

the CFTC has jurisdiction over an account or pooled investment vehicle that is

offered for the purpose of trading forex described in Section 2(c)(2)(C)(i) of the Act.

66.     As described in this Consent Order, Defendants employed or are employing a device, scheme, or artifice to defraud actual and prospective participants or engaged or are engaging in transactions, practices, or a course of business which operated or operates as a fraud or deceit upon any actual or prospective participant, including without limitation:  misappropriation of participants' funds, providing false statements to customers via electronic mail, and misrepresenting and/or omitting material facts in solicitations and communications with participants, all in violation of 7 U.S.C. § 6o(1)(A)-(B).

67.     The foregoing acts, omissions, and failures by Foster occurred within the scope of his employment, agency, or office with KEL during the Relevant Period.  Therefore, KEL is liable for Foster's violations of 7 U.S.C. § 6o(1)(A)-(B), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022).

68.     During the Relevant Period, Foster holds and exercises direct and indirect control over KEL's daily business operations and either did not act in good faith or knowingly induced KEL's violations of 7 U.S.C. § 6o(1)(A)-(B).  As a controlling person of KEL, Foster is liable for KEL's violations of 7 U.S.C. § 6o(1)(A)-(B), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

3. **Defendants' Failure to Operate Commodity Pool as a Separate Legal Entity, Failure to Receive Funds in the Pool's Name, and Commingling of Pool Funds**

69. Regulation 4.20(a)(1), 17 C.F.R. § 4.20(a)(1) (2022), requires a CPO to operate his or her commodity pool as an entity cognizable as a legal entity separate from that of the pool operator, with certain specified exceptions not applicable here.

70. Throughout the Relevant Period, KEL, while acting as a CPO, violated 17 C.F.R. § 4.20(a)(1), by failing to operate the commodity pool as a legal entity separate from itself.

71. Regulation 4.20(b), 17 C.F.R. § 4.20(b) (2022), provides: "All funds, securities or other property received by a commodity pool operator from an existing or prospective pool participant for the purchase of an interest or as an assessment (whether voluntary or involuntary) on an interest in a pool that it operates or that it intends to operate must be received in the pool's name."

72. During the Relevant Period, KEL, while acting as a CPO, violated 17 C.F.R. § 4.20(b), by receiving funds from existing or prospective pool participants for the purchase of an interest in the Pool without receiving the same in the Pool's name.

73.    Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2022), provides: "No commodity pool operator may commingle the property of any pool that it operates or that it intends to operate with the property of any other person."

74.    During the Relevant Period, KEL, while acting as a CPO, violated 17 C.F.R. § 4.20(c), by commingling pool funds with the personal funds of Foster.

75.    Foster held and exercised direct and indirect control over KEL's daily business operations and either did not act in good faith or knowingly induced KEL's violations of 17 C.F.R. § 4.20(a)(1), (b), and (c) during the Relevant Period. As a controlling person of KEL, Foster is liable for KEL's violations of 17 C.F.R. § 4.20(a)(1), (b), and (c) pursuant to 7 U.S.C. § 13c(b).

   **4.    Failure to Register as a CPO (KEL) and Failure to Register as an AP of a CPO (Foster)**

76.    Section 6m(1) of the Act, 7 U.S.C. § 6m(1), makes it unlawful for any CPO, unless registered with the Commission, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO.  Similarly, 17 C.F.R. § 5.3(a)(2)(i) requires anyone acting as a CPO for a pooled investment vehicle that engages in retail forex transactions to register as a CPO.

77.    Subject to certain exceptions not relevant here, 7 U.S.C. §2(c)(2)(C)(iii)(I)(cc) states in part, that:

A person, unless registered in such capacity as the Commission by rule,
regulation, or order shall determine and a member of a futures association
registered under section 17, shall not . . .
. . . .
(cc) operate or solicit funds, securities, or property for any pooled
investment vehicle that is not an eligible contract participant in connection
with [applicable retail forex agreements, contracts, or transactions].

78.     Except in circumstances not relevant here, 7 U.S.C. §

2(c)(2)(C)(iii)(I)(cc) and 17 C.F.R. § 5.3(a)(2)(i) require those that meet the

definition of a retail forex CPO under 17 C.F.R. § 5.1(d)(1) to register as a CPO

with the Commission.

79.     During the Relevant Period, KEL acted as a CPO by engaging in a

business that was in the nature of a commodity pool, investment trust, syndicate, or

similar enterprise, and in connection therewith, solicited, accepted, or received

from others, funds, securities, or property, either directly or otherwise, for the

purpose of trading in forex futures contracts and off-exchange leveraged, margined

or financed forex transactions, while failing to register with the Commission as a

CPO in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and 17 C.F.R. §

5.3(a)(2)(i).  During the Relevant Period, KEL was not exempt from registration as

a CPO.

80.     7 U.S.C. § 6k(2) makes it unlawful for any person to be associated

with a CPO as an officer or agent (or any person occupying a similar status or

performing similar functions), in any capacity that involves the solicitation of

funds, securities, or property for participation in a commodity pool, unless such person is registered with the Commission as an AP of a CPO. Similarly, 17 C.F.R. § 5.3(a)(2)(ii) requires anyone acting as an AP of a CPO for a pooled investment vehicle that engages in retail forex transactions to register as an AP.

81.     Except in certain circumstances not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) and 17 C.F.R. § 5.3(a)(2)(ii) require those that meet the definition of an AP of a retail forex CPO under 17 C.F.R. § 5.1(d)(2) to register as an AP of a CPO with the Commission.

82.     Throughout the Relevant Period, Foster was associated with CPO KEL as an officer or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool, while failing to register with the Commission as an AP of the CPO KEL in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii). Throughout the Relevant Period, Foster was not exempt from the requirement to register as an AP of a CPO.

83.     The foregoing acts, omissions, and failures by Foster occurred within the scope of his employment, agency, or office with KEL during the Relevant Period. Therefore, KEL is liable for Foster's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

84.     Foster held and exercised direct and indirect control over KEL and either did not act in good faith or knowingly induced KEL's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i) during the Relevant Period.  As a controlling person of KEL, Foster is liable for KEL's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i), pursuant to 7 U.S.C. § 13c(b).

85.     Each instance during the Relevant Period in which KEL acted as an unregistered CPO, including but not limited to those specifically alleged herein, is a separate and distinct violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

86.     Each instance during the Relevant Period in which Foster acted as an AP of KEL, including but not limited to those specifically alleged herein, is a separate and distinct violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii).

**5.     Defendants' Failures to Keep and Maintain Required Books and Records**

87.     Regulations 4.21 through 4.23, 17 C.F.R. §§ 4.21-4.23 (2022), in relevant part, require that each CPO registered with the Commission, or required to be registered with the Commission, keep and maintain the books and records in an accurate, current and orderly manner, including without limitation, Disclosure Documents, Account Statements, and Statements of Operations.

30

88.     As described in this Consent Order, during the Relevant Period, KEL acted as an unregistered CPO by soliciting and accepting funds from U.S. resident non-ECPs for a participation percentage in a Pool operated by KEL.  Throughout the Relevant Period, Foster was associated with CPO KEL as an officer or agent in a capacity that involves the solicitation of funds, securities, or property for participation in a commodity pool, while failing to register with the Commission as an AP of the CPO KEL, and controlled KEL's daily business operations.

89.     At no time during the Relevant Period did KEL, in accordance with 17 C.F.R. §§ 4.21-4.23, keep and maintain the books and records identified herein, and/or in the required format, in violation of 17 C.F.R. §§ 4.21-4.23.

90.     Throughout the Relevant Period, Foster directly and indirectly controlled KEL and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting KEL's violations of 17 C.F.R. §§ 4.21-4.23. Therefore, pursuant to 7 U.S.C. § 13c(b), Foster is liable as a controlling person for each of KEL's violations of 17 C.F.R. §§ 4.21-4.23.

## III.    PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

91.     Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, Foster and KEL are permanently restrained, enjoined, and prohibited from directly or indirectly:

31

(a)     While acting as a CPO or as an AP of a CPO, using the mails or any means or instrumentality of interstate commerce, directly or indirectly:  (1) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant, in violation of Section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B);

(b)     While acting as a CPO, failing to operate their commodity pool as a legal entity separate from that of the pool operator; receiving funds, securities or other property from an existing or prospective pool participant for the purchase of an interest or as an assessment (whether voluntary or involuntary) on an interest in a pool that it operates or that it intends to operate without receiving the same in the pool's name; and commingling the property of any pool that it operates or intends to operate with the property of any other person, in violation of Regulation 4.20(a)(1), (b) and (c), 17 C.F.R. § 4.20(a)(1), (b), (c) (2022);

(c)     Making use of the mails or any means or instrumentality of interstate commerce in connection with their business as a CPO, without being registered with the Commission as a CPO, in violation of Sections 2(c)(2)(C)(iii)(I)(cc) and 4m(1) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and Regulation 5.3(a)(2)(i), 17 C.F.R § 5.3(a)(2)(i);

(d)     Associating with a CPO as a partner, officer, employee, consultant, or agent (or occupying a similar status or performing similar functions), in any capacity that involves (i) the solicitation of funds, securities, or property for participation in a commodity pool or (ii) the supervision of any person so engaged, without being registered with the Commission as an AP of a CPO, in violation of Sections 2(c)(2)(C)(iii)(I)(cc) and 4k(2) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2), and Regulation 5.3(a)(2)(ii), 17 C.F.R. § 5.3(a)(2)(ii);

(e)     While acting as a CPO registered or required to be registered under the Act, failing to deliver or cause to be delivered to

prospective participants in a commodity pool that it operates or intends to operate a Disclosure Document for the commodity pool in violation of Regulation 4.21, 17 C.F.R. § 4.21 (2022);

(f)    While acting as a CPO registered or required to be registered under the Act, failing to provide participants in a commodity pool with monthly Account Statements, presented in the form of Statements of Operations and Statements of Changes in Net Assets, in violation of Regulation 4.22, 17 C.F.R. § 4.22 (2022); and

(g)    While acting as a CPO registered or required to be registered under the Act, failing to keep and maintain required books and records for a commodity pool, including, but not limited to:  (1) an itemized daily record of each commodity interest transaction of the pool; (2) a general ledger; (3) Statements of Financial Condition; and (4) Statement of Income/Loss, in violation of Regulation 4.23, 17 C.F.R. § 4.23 (2022).

92.    Foster and KEL are also permanently restrained, enjoined, and prohibited from directly or indirectly:

(a)    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

(b)    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022)), for their own personal accounts or for any account in which they have a direct or indirect interest;

(c)    Having any commodity interests traded on their behalf;

(d)    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

(e)    Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

(f)   Applying for registration or claiming exemption from
registration with the Commission in any capacity, and engaging
in any activity requiring such registration or exemption from
registration with the Commission, except as provided for in
Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and

(g)   Acting as a principal (as that term is defined in Regulation
3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or
employee of any person (as that term is defined in Section
1a(38) of the Act, 7 U.S.C. § 1a(38)), registered, exempted
from registration, or required to be registered with the
Commission except as provided for in Regulation 4.14(a)(9),
17 C.F.R. § 4.14(a)(9) (2022).

93.   Defendants are restrained from directly or indirectly destroying,
mutilating, erasing, altering, concealing, or disposing of, in any manner, directly or
indirectly, any records that relate or refer to the business activities or business or
personal finances of Defendants.

(a)   The term "records" encompasses "documents" and
"electronically stored information" as those terms are used in
Fed. R. Civ. P. 34(a), and includes, but is not limited to, all
writings, drawings, graphs, charts, photographs, sound
recordings, images, and other data or other data compilations—
stored in any medium from which information can be obtained
or translated, if necessary, into reasonable usable form. The
term "records" also refers to each and every such item in
Defendants' actual or constructive possession, including but not
limited to: (i) all such items within the custody or control of
any agents, employers, employees, or partners of Defendants;
and (ii) all items which Defendants have a legal or equitable
right to obtain from another person. A draft or non-identical
copy is a separate item within the meaning of the term. A
record also includes the file and folder tabs associated with each
original and copy.

94.     Representatives of the Commission shall be immediately allowed to inspect any records that, in part or in whole, contain, relate, or refer to the business activities or business or personal finances of Defendants, including, but not limited to, both hard-copy documents and electronically stored information ("ESI"), wherever they may be situated and whether they are in the possession of Defendants or others.  To ensure preservation and facilitate meaningful inspection and review of these records, Defendants shall allow representatives of the Commission to make copies of these records, including complete forensic images of any devices containing any such records, and if on-site copying of these records and/or forensic imaging of devices is not practicable, representatives may make such copies and/or forensic images off-site.  After any such off-site copying and/or forensic imaging, Plaintiff shall promptly return the original documents and devices upon which electronic information is stored.

95.     To further facilitate meaningful inspection and review, Defendants shall, absent a valid assertion of their respective right against self-incrimination under the Fifth Amendment, within 48 hours of service of this Order upon them, cause to be delivered to the Commission:

> (a)     The location of all records relating or referring to the business activities and business and personal finances of Defendants and provide the Commission immediate access to all such records to review and copy;

(b)   All identification numbers, other identifying information and passwords for websites, cloud storage services, encrypted ESI, email and smartphone accounts, online chat and messaging services, and all accounts at any bank, financial institution, or brokerage firm (including any introducing broker or futures commission merchant) owned, controlled or operated by Defendants, or to which Defendants have access; and

(c)   All passwords to, and the location, make and model of, all computers and/or mobile electronic devices owned and/or used by Defendants in connection with their business activities and business and personal finances.  This shall include all passwords necessary to access and use the software contained on the computer and/or mobile electronic device.

96.   When inspecting and reviewing records and/or contents of forensic images that are subject to this Order, including those contained on computers and/or mobile electronic devices, the Commission should undertake reasonable measures to prevent review of Defendants' privileged communications and other nonbusiness, nonfinancial materials by the Commission's attorneys and other staff who are part of the litigation team in this matter.  Moreover, Defendants (or their counsel) shall promptly contact Plaintiff's counsel to assert any claims of privilege relating to the inspection and review of any records or contents of forensic images that are subject to this Order and promptly cooperate with Plaintiff's counsel to develop reasonable protocols to isolate and prevent disclosure of claimed privileged and other nonbusiness, nonfinancial materials to the Commission's attorneys and other staff who are part of the litigation team in this matter.  However, nothing herein shall excuse Defendants from full and immediate

compliance with this Court's Order permitting Plaintiff to inspect and review records and contents of forensic images which relate to Defendants' business activities and their business and personal finances.

## IV.   STATUTORY AND EQUITABLE RELIEF

**IT IS FURTHER ORDERED THAT:**

97.   Foster and KEL shall, jointly and severally, pay restitution, plus post-judgment interest, to each defrauded participant.

98.   Foster and KEL shall, jointly and severally, pay disgorgement, plus post-judgement interest, to the Commission.

99.   Foster and KEL shall, jointly and severally, pay a civil monetary penalty, plus post-judgement interest, to the Commission.

100.   This Court shall determine the amounts of restitution, disgorgement, and civil monetary penalty and the procedures for payment and distribution of these monetary sanctions by further order upon: motion of the parties submitting to the Court a proposed consent order setting out their agreement on the amounts of restitution, disgorgement and civil monetary penalty to be paid by Foster and KEL in this matter; subsequent motion by the Commission; and/or hearing before this Court. The parties have 180 days from the entry of this Consent Order to resolve these issues by the joint submission of a second proposed consent order. If these issues remain unresolved after 180 days from the entry of this Consent Order, the

Commission shall file an appropriate motion no later than 14 days following the expiration of the 180-day period.

101.   In connection with any Commission motion for restitution, disgorgement, and/or civil monetary penalties, and at any hearing held on such a motion:  (a) Foster and KEL will be precluded from arguing that they did not violate the federal laws as alleged in the Complaint; (b) Foster and KEL may not challenge the validity of their consents and agreements herein or this Consent Order; (c) solely for the purposes of such motion, the allegations of the Complaint and the Findings of Fact and Conclusions of Law in this Consent Order shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure.  In connection with the Commission's motion for restitution, disgorgement, and/or civil monetary penalties, the Commission may take discovery, including discovery from appropriate non-parties.

102.   Defendants shall cooperate fully and expeditiously with the Commission, including the Commission's Division of Enforcement, in this action, and in any current or future Commission investigation related to the subject matter of this action.  As part of such cooperation, Defendants shall comply, to the full

extent of their abilities, promptly and truthfully with any inquiries or requests for information including but not limited to, requests for production of documents and authentication of documents, and shall provide assistance at any trial, proceeding, or investigation related to the subject matter of this action, including but not limited to, requests for testimony, depositions, and/or interviews. Should the Commission file any additional actions related to the subject matter of this action, Defendants are directed to appear in the judicial district in which such actions are pending, or in a suitable judicial district agreed to by the parties, to provide deposition testimony and trial testimony should such testimony be necessary.

103. Defendants shall also cooperate in any investigation, civil litigation, or administrative matter related to, or arising from, this action.

## V. MISCELLANEOUS PROVISIONS

104. Until such time as Defendants satisfy in full their Restitution, Disgorgement, and CMP obligations that may be imposed in this action, upon the commencement by or against Defendants of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of Defendants' debts, all notices to creditors required to be furnished to the Commission under Title 11 of the United States Code or other applicable law with respect to such insolvency, receivership bankruptcy or other proceedings, shall be sent to the address below:

Secretary of the Commission
Legal Division
Commodity Futures Trading Commission
1155 21st Street, NW
Washington, DC 20581

105.   Notice:  All notices required to be given by any provision in this

Consent Order, except as provided in paragraph 104 above, shall be sent certified

mail, return receipt requested, as follows:

Notice to Commission:

Paul G. Hayeck
Deputy Director
Commodity Futures Trading Commission
1155 21st Street, NW
Washington, DC 20581

Notice to Defendants Foster and KEL:

Jeffry M. Henderson
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601

All such notices to the Commission shall reference the name and docket number of

this action.

106.   Change of Address/Phone:  Until such time as Foster and KEL satisfy

in full their Restitution, Disgorgement, and CMP obligations that may be imposed

in this action, they shall provide written notice to the Commission by certified mail

of any change to their telephone number and mailing address within ten calendar

days of the change.

107.   Entire Agreement and Amendments:  This Consent Order incorporates

all of the terms and conditions of the settlement among the parties hereto to date.

Nothing shall serve to amend or modify this Consent Order in any respect

whatsoever, unless:  (a) reduced to writing; (b) signed by all parties hereto; and

(c) approved by order of this Court.

108.   Invalidation:  If any provision of this Consent Order or if the

application of any provision or circumstance is held invalid, then the remainder of

this Consent Order and the application of the provision to any other person or

circumstance shall not be affected by the holding.

109.   Waiver:  The failure of any party to this Consent Order or of any pool

participant at any time to require performance of any provision of this Consent

Order shall in no manner affect the right of the party or pool participant at a later

time to enforce the same or any other provision of this Consent Order.  No waiver

in one or more instances of the breach of any provision contained in this Consent

Order shall be deemed to be or construed as a further or continuing waiver of such

breach or waiver of the breach of any other provision of this Consent Order.

110.   Continuing Jurisdiction of this Court:  This Court shall retain

jurisdiction of this action in order to implement and carry out the terms of all

orders and decrees, including orders setting the appropriate amounts of restitution,

disgorgement and civil monetary penalty, that may be entered herein, to entertain

any suitable application or motion for additional relief within the jurisdiction of the

Court, to ensure compliance with this Consent Order and for any other purposes

related to this action, including any motion by Defendants modify or for relief

from the terms of this Consent Order.

111.   Injunctive and Equitable Relief Provisions: The injunctive and

equitable relief provisions of this Consent Order shall be binding upon the

following persons who receive actual notice of this Consent Order, by personal

service, e-mail or otherwise:  (1) Defendants; (2) any officer, agent, servant,

employee, or attorney of Defendants; and (3) any other persons who are in active

concert or participation with any person described in subsections (1) and (2) above.

112.   Authority:  Foster hereby warrants that he is the President and CEO of

KEL, and that this Consent Order has been duly authorized by KEL and he has

been duly empowered to sign and submit this Consent Order on behalf of KEL.

113.   Counterparts and Facsimile Execution:  This Consent Order may be

executed in two or more counterparts, all of which shall be considered one and the

same agreement and shall become effective when one or more counterparts have

been signed by each of the parties hereto and delivered (by facsimile, e-mail, or

otherwise) to the other party, it being understood that all parties need not sign the

same counterpart.  Any counterpart or other signature to this Consent Order that is
delivered by any means shall be deemed for all purposes as constituting good and
valid execution and delivery by such party of this Consent Order.

114.   Contempt:  Defendants understand that the terms of this Consent
Order are enforceable through contempt proceedings, and that, in any such
proceedings they may not challenge the validity of this Consent Order.

115.   Agreements and Undertakings: Defendants shall comply with all of
the undertakings and agreements set forth in this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby
directed to enter this *Consent Order for Permanent Injunction and Other Statutory
and Equitable Relief Against Defendants Dwight A. Foster and K.E.L. Enterprises,
Inc*.

**IT IS SO ORDERED** on this  18th day of _____July_____,
2023.

s/Sean F. Cox
Sean F. Cox
**Chief Judge, United States District Court**

**CONSENTED TO AND APPROVED BY:**

_[signature]_

Dwight A. Foster

Date: **7-3-23**

_[signature]_

K.E.L. Enterprises, Inc.
Dwight A. Foster, President and CEO

Date: 7-3-23

**APPROVED AS TO FORM:**

_[signature]_

Jeffry M. Henderson
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
(312)456-8453
hendersonj@gtlaw.com

Date: 7/3/23

Local Counsel

_[signature]_

Thomas W. Cranmer
P25252

Timothy J. Mulreany
MD Bar No. 8812160123
Chief Trial Attorney
Commodity Futures Trading
Commission
1155 21ˢᵗ Street, NW
Washington, DC 20581
(202) 418-5306
tmulreany@cftc.gov

Date: _____

ATTORNEY FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION

Counsel to Receive Notice

Kevin Erskine
Assistant United States Attorney
Civil Division Chief
Office of the United States Attorney
Eastern District of Michigan
211 West Fort Street
Suite 2001
Detroit, Michigan 48226
(313) 226-9100
kevin.erskine@usdoj.gov

44

Miller, Canfield, Paddock and Stone,
P.L.C.
840 W. Long Lake Rd.
Suite 150
Troy, MI 48098
248–267–3381
cranmer@millercanfield.com

ATTORNEYS FOR DEFENDANTS
DWIGHT A. FOSTER AND K.E.L.
ENTERPRISES, INC.

**CONSENTED TO AND APPROVED
BY:**


_____
Dwight A. Foster


Date: _____


_____
K.E.L. Enterprises, Inc.
Dwight A. Foster, President and CEO


Date: _____


**APPROVED AS TO FORM:**


_____
Jeffry M. Henderson
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
(312)456-8453
hendersonj@gtlaw.com


Date: _____


Local Counsel

Thomas W. Cranmer
P25252

*/s Timothy J. Mulreany*
Timothy J. Mulreany
MD Bar No. 8812160123
Chief Trial Attorney
Commodity Futures Trading Commission
1155 21st Street, NW
Washington, DC 20581
(202) 418-5306
tmulreany@cftc.gov


Date: July 3, 2023

ATTORNEY FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION

Counsel to Receive Notice

Kevin Erskine
Assistant United States Attorney
Civil Division Chief
Office of the United States Attorney
Eastern District of Michigan
211 West Fort Street
Suite 2001
Detroit, Michigan 48226
(313) 226-9100
kevin.erskine@usdoj.gov

44

Miller, Canfield, Paddock and Stone,
P.L.C.
840 W. Long Lake Rd.
Suite 150
Troy, MI 48098
248–267–3381
cranmer@millercanfield.com

ATTORNEYS FOR DEFENDANTS
DWIGHT A. FOSTER AND K.E.L.
ENTERPRISES, INC.